UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
ALBANY DIVISION

UNITED STATES OF AMERICA,	CRIMINAL NO. 08-749 (GLS)

    Plaintiff,

  v.

THOMAS SPARGO,

    Defendant.
_____/

## UNITED STATES' TRIAL BRIEF

The United States, by its attorneys, Richard C. Pilger and M. Kendall Day, hereby files the attached trial brief in support of the admissibility of its evidence at trial.

                Respectfully submitted,

                WILLIAM M. WELCH II
                CHIEF
                PUBLIC INTEGRITY SECTION

                s/ M. Kendall Day
                Richard C. Pilger, Senior Trial Attorney
                M. Kendall Day, Trial Attorney
                Public Integrity Section
                U.S. Department of Justice
                1400 New York Ave, NW Suite 12100
                Washington, DC 20005
                202-514-1412
                (F) 202-514-3003
                richard.pilger@usdoj.gov
                m.kendall.day@usdoj.gov

Date: July 27, 2009

# MEMORANDUM OF LAW - TABLE OF CONTENTS

I.  **BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.  November 13, 2003 - Spargo Solicits $10,000 After a Conference with Blatchly  1

    B.  December 1, 2003 - Spargo Invites Blatchly to Lunch . . . . . . . . . . . . . . . . . . . . . . 3

    C.  December 11, 2003 - Spargo's Friend Rosenblum Tells Blatchly
"We" Are Looking for $10,000 from Blatchly . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.  December 11 to December 19 - No Contributions Are Made . . . . . . . . . . . . . . . . 4

    E.  December 19, 2003 - Spargo Calls Blatchly on His Cell Phone . . . . . . . . . . . . . . 5

    F.  After the December 19th Call . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II. **PROOF AT TRIAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    A.  Count 1 - Attempted Extortion in Violation of 18 U.S.C. 1951 . . . . . . . . . . . . . . 7

    B.  Count 2 - Attempted Bribery in Violation of 18 U.S.C. § 666 . . . . . . . . . . . . . . 10

III. **EVIDENTIARY ISSUES**

    A.  Admission of Statements by Spargo and Rosenblum . . . . . . . . . . . . . . . . . . . . . 11

    B.  Admission of Blatchly's Prior Consistent Statements . . . . . . . . . . . . . . . . . . . . . 12

    C.  404(b) Evidence and the Bases For Its Admission . . . . . . . . . . . . . . . . . . . . . . . 14

**I.     BACKGROUND**

In 2001, Defendant Thomas J. Spargo was elected as a State Supreme Court Justice in the Third Judicial District of New York. On January 25, 2002, Spargo was formally accused by the New York State Commission on Judicial Conduct (the "Commission") of a variety of ethical transgressions unrelated on their merits to the crimes charged in the indictment. By September 2003, evidence will show that Spargo's legal bills in connection with the Commission's investigation had outstripped his ability to pay them. Spargo had amassed more than $97,000 worth of unpaid legal bills, yet he had made only one payment - for $2,500.

In September 2003, a bank account for Spargo's legal defense fund was opened with a $1,000 contribution from Spargo's mother. Until November 2003, no additional contributions were made to Spargo's legal defense fund. Nor did Spargo make any additional payments to his defense attorneys. Spargo, however, continued to accrue legal bills, with total unpaid legal expenses of well more than $100,000 as of November 1, 2003.

   A.     <u>November 13, 2003 - Spargo Solicits $10,000 After a Conference with Blatchly</u>.

On November 13, 2003, at the close of a status conference in a room at the Ulster County Courthouse, defendant waited for opposing counsel to exit the room before addressing the other persons who were present. Defendant then asked the court clerk, Beth Cornell, who had remained at the open door to defendant's chambers, to step outside so that he could discuss a "judge" matter with one of the attorneys who had appeared in the prior status conference, Bruce Blatchly (Blatchly was also a Town Judge in Gardiner, New York).

Once defendant and Blatchly were alone, defendant told Blatchly about defendant's ongoing battle with the Commission, and the fact that defendant had rising legal expenses. The

1

defendant told Blatchly that he had set up a legal defense fund and that, rather than broadly soliciting money from the public, he was asking three attorneys, who had regular business in front of him, including Blatchly, to give $10,000 apiece to defendant's legal defense fund. Defendant identified the other two attorneys as Maureen Keegan and Al Mainetti, both of whom are members of two-partner personal injury firms that handle the majority of plaintiffs' work in Ulster County.  When Blatchly responded that he was not sure what he could do, but that he would consider paying if defendant gave him some information about the propriety of doing so, defendant told Blatchly that someone would contact Blatchly on defendant's behalf in the near future.

      Blatchly had had no prior conversations with Spargo or anyone else about the defendant's fund, and had never offered to assist Spargo.  Blatchly had no personal relationship with Spargo - they were not friends.  Blatchly practiced before defendant, however, and in the preceding year Spargo had presided over a tort case in which he had approved an award to Blatchly's firm of approximately $1 million in fees,[1] an amount to be paid out over time in 2003.

      After the meeting, Blatchly researched the ethics rules, and concluded it was improper for him to make the contribution Spargo had solicited.

      In adversary Commission proceedings, Spargo admitted meeting with Blatchly, but denied Blatchly's account.  Indeed, Spargo accused Blatchly of making improper remarks.

---

[1]The entire award to the plaintiff was in excess of $3 million.  Because the plaintiff was a minor, Spargo was required to approve receipt by Blatchly's firm of its contingency share.

Spargo also denied asking his clerk, Beth Cornell, to leave the room, an event which Cornell remembers.

        B.       December 1, 2003 - Spargo Invites Blatchly to Lunch.

Next, on December 1, 2003, Spargo personally called Blatchly to invite him to a lunch to be held in Ulster County on December 11, 2003. Spargo further indicated that the lunch would include a discussion of the subject covered after the November 13 status conference, but Spargo avoided saying directly that the purpose of the lunch was to solicit money. Spargo said that Keegan and Mainetti would also be there, and they were the other two lawyers Spargo previously had identified to Blatchly as also being targeted to pay $10,000. Spargo also said that he wanted Blatchly, Keegan, and Mainetti to meet some people at the lunch.

In adversary Commission proceedings, Spargo took the stand and admitted making the December 1 call, which is corroborated by several sources, including a contemporaneous email from Blatchly's secretary telling Blatchly, "Tom Spargo is holding on -4600. Can you take it or do you want me to take a message?"

Although Blatchly had ethical concerns about making a contribution or attending a luncheon for that purpose, he decided to attend the luncheon.

        C.       December 11, 2003 - Spargo's Friend Rosenblum Tells Blatchly "We" Are Looking for $10,000 from Blatchly

On December 11, 2003, Blatchly attended the lunch at Le Canard, a restaurant in Kingston. There, Blatchly was joined by defendant, Albany attorney Sanford Rosenblum, Catherine Doyle (the Albany County Surrogate), Keegan, Mainetti, and two other lawyers, Eli Basch and Joseph O'Connor, who were law partners of Keegan and Mainetti, respectively. The conversation during the lunch included a discussion of defendant's litigation against the

3

Commission, in which Spargo had suffered a loss in the United states Court of Appeals on December 9, 2003. Blatchly was among the first to leave the lunch because he had to attend a status conference with the defendant's law clerk in the courthouse.

As Blatchly left, Rosenblum followed him to the coatroom. Rosenblum, whom Blatchly had just met, asked Blatchly for a $10,000 payment to defendant's defense fund, saying words to the effect of, "We're looking for $10,000 from you. Can you help us out?" As Blatchly explained to Rosenblum his reservations about paying a judge sitting on his cases, defendant himself joined Blatchly and Rosenblum in the coat area. Blatchly then bid them both farewell, and left the restaurant to meet with defendant's law clerk about a pending case.

Rosenblum returned to the lunch table. At some point, defendant and Doyle left the lunch. Rosenblum thereafter told the three remaining attorneys – Basch, Keegan, and O'Connor – that the legal costs of defendant's litigation were very expensive for defendant. Rosenblum then mentioned that defendant had a legal defense fund, and Rosenblum asked each of those present for a $10,000 payment. Each of the three lawyers had cases pending before defendant, and Mainetti and O'Connor were parties to a lawsuit that had been assigned to defendant.

Spargo did not pay for the lunch to which he had invited the attorneys, and at which they were solicited to contribute money. Rather, one of those solicited to make a contribution paid the bill.

      D.     <u>December 11 to December 19 - No Contributions Are Made</u>

From December 11 to December 19, neither Blatchly nor any of those present at the lunch made the payments which had been requested of them. In addition to Blatchly, the other attorneys solicited at the lunch by Rosenblum felt varying degrees of discomfort with the request

that had been made of them by Rosenblum.  Indeed, like Blatchly, none of the other solicited attorneys had a personal relationship with either Rosenblum or Spargo, knowing Spargo only as attorneys appearing before a judge.  In the end, none of those present made a contribution.

During the same period, Spargo's legal bills continued to mount.  Billing records show that the attorney then representing Spargo in the Commission's investigation - David Kunz - continued to work on Spargo's matter during this time.  From December 9, 2003 through December 18, 2003, Kunz and another working with him spent more than 14 hours working on Spargo's case, with Kunz's time billed at $250 per hour.

   E. <u>December 19, 2003 - Spargo Calls Blatchly on His Cell Phone</u>.

As of December 19, 2003, Blatchly was among those who still had not made a payment to defendant's defense fund.  That morning, defendant called Blatchly on his cell phone – it was the first time that defendant ever called Blatchly's cell phone number, having obtained the number from Blatchly's office that morning.  During this call, defendant told Blatchly of the judicial assignments for 2004, which had been announced the prior evening.  Defendant told Blatchly that defendant was again being assigned to handle cases in Ulster County.  Defendant reminded Blatchly of the lunch that they had attended with Judge Doyle at Le Canard.  He then told Blatchly that Doyle had been assigned to handle the case load of Judge Christian Hummel, who, as Blatchly and defendant had previously discussed, was handling Blatchly's personal divorce case.  After telling Blatchly that Hummel's cases were transferred to "Kate," defendant ended the call by telling Blatchly words to the effect of, "It looks like it will be a good Christmas for me."

In adversary Commission proceedings, Spargo took the stand and admitted placing this call and its contents except for the last remark about "a good Christmas for me."

### E. After the December 19th Call

Blatchly was upset by the December 19, 2003, call, which took place on a Friday. That day he told his law partner, Jon Simonson, about the call, and Simonson advised him to report it to Supreme Court Justice Michael Kavanaugh. On the following Monday, December 22, Blatchly sought Kavanaugh's advice about Spargo's repeated solicitations. Kavanaugh advised Blatchly that Blatchly had a duty to report the matter to the Commission, and that if Blatchly did not, Kavanaugh would. Kavanaugh sent Blatchly to speak with Justice Karen Peters of the intermediate appellate court, who was a member of the Commission. Blatchly spoke to Peters that day, and she immediately initiated the complaint process leading to a supplemental Commission complaint against Spargo, which contained the allegation that Spargo had improperly solicited money from Blatchly.

On March 29, 2006, the Commission removed Spargo from office. Prior to that decision, the Commission's referee had held lengthy adversarial hearings, during which Spargo and the Commission Administrator were both represented by counsel. The adversarial proceedings were conducted as a bench trial, with both sides making opening statements, taking the testimony of witnesses through direct and cross examination, making repeated evidentiary objections to which the referee gave rulings, and making closing arguments.[2]

---

[2] As to the allegation that Spargo engaged in misconduct by soliciting $10,000 from Blatchly, the 10 Commission members unanimously found that Spargo had committed misconduct and voted unanimously to sanction him through the Commission's most severe sanction - removal. In so voting, the Commission concluded that there was clear and convincing evidence that Spargo had solicited money as Blatchly had testified (notwithstanding Spargo's

**II.     Proof at Trial**

   A.     <u>Count 1 - Attempted Extortion in Violation of 18 U.S.C. 1951</u>

In order to convict defendant Spargo of attempted interference with interstate commerce, the evidence must establish the following three elements:

First:         that defendant Spargo attempted to take from Bruce Blatchly the property described in Count 1 of the indictment, namely $10,000;

Second:    that defendant Spargo attempted to do so knowingly by extortion; and

Third:        that if defendant's actions had been successful, interstate commerce or an item moving in interstate commerce would have been obstructed, delayed, or affected.

3d Cir. Criminal Jury Inst. 6.18.1951 (modified for attempt); <u>see also</u> <u>United States v. Clemente</u>, 22 F.3d 477, 480 (2d Cir. 1994) (noting that Section 1951 requires proof of (1) interference with commerce and (2) extortion).

The indictment charges two distinct ways in which defendant extorted Blatchly: (1) under color of official right and, (2) induced by fear of economic harm. Color-of-official-right extortion requires proof merely that Spargo - as a public official - sought a payment to which he was not otherwise entitled by his office, knowing that the payment would be made in return for official acts. <u>See</u> <u>United States v. Ganim</u>, 510 F.3d 134, 143 (2d Cir. 2007) (Sotomayor, J.)

---

denials of the same). Indeed, one concurring Commission member noted that his vote for removal was shaped in no small part by Blatchly's credibility. In that member's words, Blatchly's "reasonably prompt report to the Commission of the solicitations, with no ulterior motive of any type, as well as the very real possibility of severe adverse personal and career consequences to him, corroborate his credibility and confirm the referee's and Commission's unanimous conclusions."

7

(citing Evans v. United States, 504 U.S. 255, 257 (1992)).  For color-of-official-right extortion, it is not necessary to prove any affirmative act of coercion by the public official - "the coercive element is provided by the public office itself."  Evans v. United States, 504 U.S. at 266.  The evidence at trial will show that Spargo solicited a $10,000 payment to which he was not entitled, knowing that it would be made in exchange for official acts.

Similarly, the evidence at trial will establish Blatchly's fear of economic harm. Fear-of-economic-harm extortion requires proof only that Blatchly had a reasonable fear that his failure to pay Spargo would result in preclusion from or diminished opportunity for some existing or potential economic benefit - there is no requirement that Blatchly's fear arise from a detailed or pointed threat made by Spargo.  United States v. Capo, 817 F.2d 947, 951 (2d Cir. 1987).  The evidence at trial will include testimony that Blatchly feared at least two outcomes if he did not pay: (1) that Spargo would take adverse actions in the cases Blatchly had before Spargo; and (2) that Spargo would influence Spargo's close friend Judge Doyle to take adverse actions in Blatchly's personal divorce case.

In his motion to dismiss the indictment, Spargo argued that the government could not prove the required effect on interstate commerce.  He is mistaken.  The burden is minimal: "The Second Circuit has consistently held that only a *de minimis* showing is necessary to establish the interstate nexus required for Hobbs Act jurisdiction."  United States v. Savoca, 335 F. Supp. 2d 285 (2d Cir. 2004) (citing United States v. Fabian, 312 F.3d 550, 554 (2d Cir. 2002)).  The Second Circuit recognizes five ways in which the interstate commerce element of an attempted extortion count may be satisfied.  See United States v. Perotta, 313 F.3d 33, 38 (2d Cir. 2002) (outlining five independently sufficient ways in which to prove affect on interstate commerce).

Four of those ways will be proven in the government's case, any one of which is independently sufficient to support a finding that Spargo's attempted extortion had the required potential for a *de minimis* affect on interstate commerce. Those four ways include:

    *1.* "that the harm or potential harm to the individual would deplete the assets of a company engaged in interstate commerce." Perotta at 38. In our case, Blatchly will testify that, had he made the requested $10,000 payment, he would have used the business account of his law practice and that he therefore would have less money available in that account for the purchase of goods in interstate commerce. Courts have upheld prosecutions relying upon similar depletion-of-asset theories in the context of small law firms. See, e.g., United States v. Stillo, 57 F.3d 553, 558 (7th Cir. 1995) (affirming conviction based on depletion of assets theory where extortion payment was made from a law firm's general account, which account was otherwise used to purchase goods that traveled in interstate commerce, such as a calculator and will covers); or

    *2.* "that the victim directly participated in interstate commerce." Perotta at 38. Blatchly will testify that his firm purchased goods, such as Westlaw internet research services and automobiles, in interstate commerce; or

    *3.* "that the crime targeted the assets of a business rather than an individual." Id. Both direct and circumstantial evidence will show that Spargo targeted Blatchly and the other attorneys because of their firms' successes in personal injury cases handled by Spargo.

    *4.* "That the individual was extorted of a sum so large, or targeted in connection with so many individuals, that the amount at stake cumulatively had some effect on interstate commerce." Id. Courts have routinely held that payments much smaller than $10,000

9

are sufficient to have the required *de minimis* impact on interstate commerce. See, e.g., United States v. Blakely, 607 F.2d 779, 784 (7th Cir. 1979) (in affirming conviction effect on interstate commerce by a $1,000 payment, the Court collected other decisions involving amounts as small as $150, $200, and $300).

      B.      Count 2 - Bribery in Violation of 18 U.S.C. § 666

In order to convict defendant Spargo of the crime of federal program bribery as charged in Count 2 of the indictment, the evidence must establish the following:

| | |
|---|---|
| First: | Thomas J. Spargo was an agent of the Third Judicial District of New York State; |
| Second: | that the Third Judicial District of New York State received federal benefits in excess of $10,000 in a one-year period; |
| Third: | that defendant Spargo solicited or demanded something of value from Bruce Blatchly; |
| Fourth: | that defendant Spargo acted corruptly with the intent to be influenced or rewarded in connection with the business, transaction, or series of transactions of the Third Judicial District of New York State; and |
| Fifth: | that the value of the business, transaction, or series of transactions to which the payment related was at least $5,000. |

3d Cir. Crim. Jury Inst. 6.18.666A1B.

The only additional proof for this offense as opposed to the Hobbs Act involves the jurisdictional predicate. As to the $10,000 in federal benefits, defendant Spargo has agreed to stipulate that the Third Judicial District - in particular the Ulster County and Albany County Courts - received tens of thousands of dollars worth of federal grants during the one-year period

10

beginning January 1, 2003. That stipulation is sufficient to establish the interstate commerce element given that there is no requirement to show a nexus between the federal funds and the criminal activity. Sabri v. United States, 541 U.S. 600 (2004). As to the $5,000 worth of business to which the $10,000 payment related, Blatchly will testify that the value of the cases he had pending in front of defendant Spargo well exceeded this $5,000 threshold, as did Blatchly's divorce case assigned to Judge Doyle.

### III. Evidentiary Issues

#### A. Admissions of Statements by Spargo and Rosenblum

The government will seek to admit several categories of non-hearsay, out-of-court statements. First, the government will offer Spargo's statements to witnesses as well as his testimony during the Commission's proceedings pursuant to Fed.R.Evid. 801(d)(2)(A). That evidence will either be read to the jury by a witness who was present for Spargo's testimony, or read by an FBI agent, or played for the jury using audio tapes of Spargo's testimony. Second, the government will offer Rosenblum's statements to witnesses for multiple purposes, including as statements in further of a conspiracy pursuant to Fed.R.Evid. 801(d)(2)(E). Rosenblum's statements are also admissible for the non-hearsay purpose of showing their effect on the listeners. See, e.g., United States v. Lambinus, 747 F.2d 592, 597 (10th Cir. 1984) (allowing one detective to testify about conversation he had with another detective in the presence of the defendant to show the effect of that conversation on the defendant's state of mind). Indeed, the extortion charge requires us to prove that Blatchly's fear of economic harm was reasonable, and Rosenblum's statements to Blatchly are a necessary part of that proof.

Defendant Spargo may not admit either his own statements or those of Rosenblum, his coconspirator. Fed.R.Evid. 801(d)(2) (out-of-court statements of a party are admissible only by the party opponent); see also United States v. Milstein, 401 F.3d 53, 73 (2d Cir. 2005) (excluding a tape of a co-conspirator's statements when tape was offered by the defendant). Because the statements we intend to offer are complete and fair with respect to the issues contained in each statement, defendant Spargo may not use the Rule of Completeness (Fed.R.Evid. 106) to admit additional statements not first offered by the government. See United States v. Johnson, 507 F.3d 793, 796 (2d Cir. 2007) (the completeness doctrine does not require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages); see also Trepel v. Roadway Express, Inc., 194 F.3d 708, 718 (6th Cir. 1999) (the completeness doctrine of Rule 106 should not be used to make something admissible that would otherwise be excluded).

B.  Admission of Blatchly's Prior Consistent Statements

The government anticipates that the defendant will attempt to impeach the credibility of Blatchly and attack his account as a fabrication. If so, then the government may offer Blatchly's prior consistent statements to third parties. Although such statements are usually offered as substantive evidence when used to rebut an express or implied charge of recent fabrication, improper influence, or motive pursuant to Fed.R.Evid. 801(d)(1)(B), there is a non-hearsay purpose for which such statements may be admitted.

Prior consistent statements are admissible as non-hearsay statements when offered for the rehabilitation of a witness. In United States v. Brennan, 798 F.2d 581 (2d Cir. 1986), the Second Circuit discussed this second basis for admissibility at length. Similar to the case at bar, Brennan

involved corruption charges brought against a New York State Supreme Court Justice where, at trial, the key issue was the credibility of a single witness - Anthony Bruno - as "only Bruno's testimony provided direct evidence of payments to [Judge] Brennan for the purpose of corrupting cases." Id. at 587.  In cross examining Bruno, the defendant expanded on a problem first fronted by the prosecution, namely that Bruno had been less than fully truthful during his first grand jury testimony.  On redirect of Bruno, the trial court permitted the government to introduce Bruno's prior consistent statements by reading into the record portions of Bruno's multiple grand jury appearances.

Courts use a more generous standard of admissibility to evaluate prior consistent statements offered to rehabilitate rather than pursuant to Fed.R.Evid. 801(d)(1)(B).  Brennan at 587-588.  As a result, the admission of Bruno's testimony to the grand jury to amplify and clarify the allegedly inconsistent statements was deemed proper, even though the prior consistent statements were not admissible as substantive evidence pursuant to Fed.R.Evid. 801(d)(1)(B). Id. at 587-89. Although the facts of Brennan involve rehabilitation of a witness after the witness had been impeached based on prior inconsistent statements, rehabilitation is a proper basis for admissibility in other potential circumstances, too, so long as the prior consistent statement "has a probative force bearing on credibility beyond merely showing repetition." Id. at 588 (citing United States v. Pierre, 781 F.2d 329 (2d Cir. 1986)).  See also United States v. Castillo, 14 F.3d 802, 806 (2d Cir. 1994) (same).  As with the admission of any evidence for a limited purpose, the Court, of course, should instruct the jury regarding the purpose for which the prior consistent statements are admitted (i.e., for the limited purpose of helping the jury assess the witness's

credibility).  See United States v. Al-Moayad, 545 F.3d 139, 167 (2d Cir. 2008) (prior consistent statements are admissible for rehabilitation "if appropriately limited").

       C.      404(b) Evidence and the Bases For Its Admission

Although the government does not intend to offer evidence regarding the specifics of the original, underlying ethics charges, our evidence necessarily will include the fact that Spargo was under investigation by the Commission for unspecified ethical transgressions.  Evidence of the fact of an ethics investigation, without reference to the underlying ethical transgressions, is not technically within Federal Rule of Evidence 404(b) because it is inextricably intertwined with the conduct charged because it is "necessary to complete the story of the crime on trial...." United States v. Quinones, 511 F.3d 282, 308 (2d Cir. 2007) (internal quotations and citations omitted).  Indeed, it would be impossible to remove references to the Commission's investigation, as it was mentioned by Spargo during his initial solicitation of Blatchly on November 13, 2003, as well as repeatedly during the lunch that took place on December 11, 2003.  As such, evidence of the Commission's investigation is "appropriately treated as part of the very act charged or, at least, proof of that act."  Id. (internal quotations and citations omitted).

Moreover, and in the alternative, the evidence of mounting legal fees in connection with the Commission proceedings is also highly probative of motive in this case.  Thus, even under a Rule 404(b) analysis, such evidence is admissible to prove, among other things, Spargo's motive and intent.

Spargo may attempt to resist the admission of his testimony to the Commission using Rule 404(b), but the Court should resist any attempt to evaluate the admissibility of those

statements as other act evidence.  First, Spargo's statements are not evidence of other conduct, as the government is not attempting to prove that Spargo actually committed the crime of perjury under New York law in making his statements to the Commission.  Moreover, even if the government were trying to establish a state-law perjury crime committed by Spargo, the evidence of Spargo's testimony is inextricably intertwined with the conduct charged and, therefore, not subject to Rule 404(b) analysis.  Quinones, 511 F.3d at 308.  Finally, even if the government were attempting to make out the state-law crime of perjury, such evidence would be admissible pursuant to Rule 404(b) as strongly probative of Spargo's knowledge and intent.  See, e.g., United States v. Perez, 387 F.3d 201, 208-209 (2d Cir. 2004) (affirming admission of testimony that defendant had asked another to lie to investigators because such evidence was probative of defendant's knowledge and intent).

Finally, the government may offer evidence that Rosenblum and Spargo previously had attempted to extort another attorney for a large payment.  Specifically, shortly before the judicial elections in 2001, Rosenblum solicited Albany attorney Jonathan Fairbanks for a $5,000 to $10,000 campaign contribution, telling him words to the effect of, "Tom Spargo will know who contributed."  Rosenblum made other statements to Fairbanks suggesting that Spargo would provide favorable treatment in return for the campaign contribution.  Rosenblum also told Fairbanks that the reason Rosenblum had selected Fairbanks for the solicitation was because Fairbanks was on a list of successful personal injury attorneys.  Ultimately, Fairbanks declined to make a campaign contribution.

In July 2002, Fairbanks tried a personal injury case in front of the defendant, who by then had become a judge.  According to Fairbanks, defendant "beat him up" throughout the trial.

After Fairbanks' client lost the trial, defendant came out into the then empty courtroom and told Fairbanks, "You gotta be careful where you invest your money.  I invested in palm pilot and lost money.  I made a mistake as to where I put my money."  The statement by Spargo was unconnected with any prior topic of discussion - the two were not discussing money, or investing, in any way.  Fairbanks reasonably interpreted Spargo's remarks to be a reference to Fairbanks' refusal to make the campaign contribution less than one year before.

The attempted extortion of Fairbanks is admissible pursuant to Fed.R.Evid. 404(b) to show, among other things, evidence of a common plan by Rosenblum and Spargo to extort large payments from attorneys who (a) were financially successful, and (b) had business in front of Spargo.  See, e.g., United States v. Rivera-Medina, 845 F.2d 12, 15-16 (1st Cir. 1988) (in a case where a police officer was charged with extortion, evidence that he had previously entered into similar extortion schemes with the same coconspirator was admissible to prove absence of mistake, knowledge, and intent).  Moreover, this evidence is admissible to show the relationship between coconspirators Rosenblum and Spargo and Spargo's knowledge of Rosenblum's solicitation of Blatchly the day of their lunch at Le Canard.  See, e.g., United States v. Alex, 790 F. Supp. 801, 802 (N.D. Ill. 1992) (evidence of prior arson schemes is admissible in a RICO trial to show defendant's relationship with his coconspirator as well as defendant's knowledge and the coconspirators' common scheme and plan).

        Respectfully submitted,

        WILLIAM M. WELCH II
        CHIEF
        PUBLIC INTEGRITY SECTION

        <u>s/ M. Kendall Day</u>
        Richard C. Pilger, Senior Trial Attorney
        M. Kendall Day, Trial Attorney
        Public Integrity Section
        U.S. Department of Justice
        1400 New York Ave, NW Suite 12100
        Washington, DC 20005
        202-514-1412
        (F) 202-514-3003
        <u>richard.pilger@usdoj.gov</u>
        m.kendall.day@usdoj.gov

Date: July 27, 2009

**CERTIFICATE OF SERVICE**

      I, M. Kendall Day, certify that on July 27, 2009, electronic notice of the instant filing was served on the following persons via the CM-ECF system:

E. Stewart Jones, Jr., Esq.
bessetca@esjlaw.com
youngtr@esjlaw.com